UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                  Case No. 23-cr-0141-bhl

CLIFTON NEAL,

        Defendant.

---

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION DENYING DEFENDANT'S MOTION TO DISMISS

---

On May 13, 2023, Milwaukee police officers attempted to stop Defendant Clifton Neal's car after observing him driving erratically. (ECF No. 13 at 1.) Neal initially fled, but after a brief chase, pulled over, exited his vehicle, and ran down an alley. (*Id.*) As officers pursued him, one of them heard a loud bang come from a dumpster. (*Id.*) Neal was ultimately apprehended, and officers then returned and searched the dumpster, finding a loaded Glock pistol on top of the trash. (*Id.* at 2.) Officers also searched Neal's vehicle and recovered four scales, identifiers for Neal, a cell phone, a box of baggies, and a total of 525 grams of marijuana. (*Id.*) At the time, Neal was a convicted felon, having been convicted in 2018 on two counts of knowingly fleeing or attempting to elude an officer in violation of Wis. Stat. § 346.04(3), a Class I felony (Case Nos. 2018CF002863 & 2018CF004650), and one count of possession with intent to distribute marijuana in violation of Wis. Stat. § 961.41(1m)(h)3, a Class G felony (Case No. 2018CF003088).[1] (ECF No. 11 at 2.)

On August 1, 2023, a grand jury indicted Neal on a single count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (ECF No. 1.) Neal has moved to dismiss the indictment, arguing that Section 922(g)(1) is unconstitutional—both

---

[1] Neal was revoked on June 27, 2023, in Milwaukee County Case Nos. 2018CF002863 and 2018CF004650 and is currently serving a sentence of one year and seven months in state custody. (ECF No. 3 at 1.)

facially[2] and as applied to him—in light of the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). (ECF No. 11 at 1.) In *Bruen*, the Supreme Court confirmed that law-abiding citizens have a Second Amendment right to possess arms for self-defense. 597 U.S. at 8–19. The Court also discussed the appropriate standard for adjudicating challenges to government restrictions on an individual's right to bear arms. *Id.* at 24–31. The *Bruen* Court explained that where the state attempts to limit conduct that is presumptively protected by the Second Amendment, the government must justify its regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. Invoking *Bruen*, Neal argues that his conduct—the possession of a firearm—is covered by the plain text of the Second Amendment and is presumptively protected by the Constitution, and the government cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." (ECF No. 11 at 4 (quoting *Bruen*, 597 U.S. at 19) (added emphasis removed).)

On October 17, 2023, Magistrate Judge William E. Duffin recommended denial of Neal's motion. (ECF No. 15.) Judge Duffin reasoned that "history and tradition demonstrate that persons determined by the legislature to be unvirtuous may be disarmed," and "[a] person who committed a serious crime, including any offense designated as a felony, is not among the virtuous." (*Id.* at 16.) He therefore concluded that Section 922(g)(1) is constitutional, both facially and as applied to Neal. (*Id.*) Neal has filed timely objections to the report. (ECF No. 16.) For the reasons stated below, the Court overrules Neal's objections, adopts the magistrate judge's report and recommendation, and concludes that 18 U.S.C. § 922(g)(1) is constitutional. Neal's motion to dismiss is denied.

## STANDARD OF REVIEW

A district court reviews *de novo* "those portions of [a Magistrate Judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3). This "review requires the district court judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Mendez v. Republic Bank*, 725 F.3d

---

[2] "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

651, 661 (7th Cir. 2013). The district court "makes the ultimate decision to adopt, reject, or modify" the magistrate judge's recommendation. *Schur v. L.A. Weight Loss Ctrs.*, 577 F.3d 752, 760 (7th Cir. 2009). Unchallenged portions of the report are reviewed only for clear error. *See Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) (citing *Goffman v. Gross,* 59 F.3d 668, 671 (7th Cir. 1995)).

## ANALYSIS

I. **The Second Amendment Limits the Government's Ability to Regulate an Individual's Right to Bear Arms.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Over the last two decades, the Supreme Court has clarified the scope of the Second Amendment's protections in a trilogy of cases: *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen*. Through these precedents, the Court has confirmed that the Second Amendment right to bear arms is not a vacuous platitude. At the same time, the Court has repeatedly emphasized that Second Amendment rights are not without limitation; government regulation of firearm possession does not offend the Constitution in all instances.

In *Heller*, the Court struck down a District of Columbia law that, among other things, banned handgun possession in the privacy of an individual's home. 554 U.S. at 636. In arriving at this result, the Court reviewed the original understanding of the Second Amendment at the time the Bill of Rights was adopted and confirmed that it secures the right of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. The Court took pains to emphasize that "the right secured by the Second Amendment is not unlimited." *Id.* at 626 ("[T]he right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). In particular, the Court stressed that it was not casting doubt on "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." *Id.* at 626–27. Such regulatory measures remain "presumptively lawful." *Id.* at 627 n.26.

Two years later, in *McDonald*, the Supreme Court confirmed that the right to keep and bear arms for self-defense is among the individual federal rights protected from state interference under the Due Process Clause of the Fourteenth Amendment. 561 U.S. at 791. *Heller* had applied the Second Amendment to a law enacted under the authority of the federal government in the District of Columbia. *Id*. at 749–50 (citing *Heller*, 554 U.S. 570). *McDonald* held that the right recognized

in *Heller* was "among those fundamental rights necessary to our system of ordered liberty" and thus applicable to the states through the Fourteenth Amendment. *Id*. at 778, 791. In reaching this holding, the Court again emphasized that an individual's right to bear arms can be subject to regulation in certain contexts. Thus, "longstanding regulatory measures [such] as 'prohibitions on the possession of firearms by felons and the mentally ill'" are appropriate and consistent with the Second Amendment. *Id.* at 786 (quoting *Heller*, 554 U.S. at 626–27).

In 2022, the Supreme Court decided *Bruen* and confirmed that the Second Amendment "protect[s] the right of an ordinary, law-abiding citizen . . . to carry a handgun for self-defense outside the home." 597 U.S. at 9–10. The Court struck down as unconstitutional New York State's concealed carry law, which required an individual to prove "proper cause" before obtaining a license that would allow the carrying of a concealed "pistol or revolver" in public. *See* N.Y. Penal Law § 400.00(2)(f) (McKinney 2022). The Court held New York's proper-cause requirement unconstitutional because it prevented law-abiding citizens who have ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms. *Bruen*, 597 U.S. at 38–39. In arriving at this result, the Court rejected what it termed the "two-step approach" that several Courts of Appeal, including the Seventh Circuit, had adopted to evaluate firearm regulations, calling it "one step too many." *Id.* at 19.

The *Bruen* Court clarified that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* Instead, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Thus, "[o]nly if a firearm regulation is consistent with this Nation's historical tradition [of firearm regulation] may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961); *see also id.* at 22–24 (rejecting means-end scrutiny and reiterating the standard for applying the Second Amendment). Accordingly, for laws restricting individual conduct covered by the plain text of the Second Amendment, the government is required to demonstrate that the regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. This inquiry "involve[s] reasoning by analogy" and a determining if the law at issue is "relevantly similar" to historically accepted regulations. *Id.* at 28–29 (partially quoting C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)). The central considerations are "whether modern and historical regulations impose a comparable burden on the

right of armed self-defense and whether that burden is comparably justified. *Id.* at 29. This "analogical reasoning" is "neither a regulatory straightjacket nor a regulatory blank check" and "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. at 30 (emphasis in original).

II.     **A Substantial Majority of Courts Have Upheld 18 U.S.C. § 922(g).**

When Neal was indicted and filed his motion to dismiss, neither the Supreme Court nor the Seventh Circuit had applied *Bruen*'s teachings to the federal felon-in-possession statute, 18 U.S.C. § 922(g). In 2010, the Seventh Circuit decided *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010), and held that Section 922(g)(3) was constitutional as applied to a convicted drug dealer. The Court of Appeals explained that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" 621 F.3d 681, 684–85 (7th Cir. 2010) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010))). Five years later, in *United States v. Meza-Rodriguez*, the Court of Appeals questioned whether the Second Amendment was limited to "law abiding" citizens, but nevertheless rejected an unlawfully present noncitizen's Second Amendment challenge to a Section 922(g)(5) indictment. 798 F.3d 664, 672–73 (7th Cir. 2015). Both of these cases preceded *Bruen*.

In *Atkinson v. Garland*, the Seventh Circuit was presented with the constitutionality of the felon-in-possession-statute post-*Bruen* but declined to decide the issue, choosing to remand the case to allow the district court to conduct a "proper, fulsome analysis of the historical tradition supporting § 922(g)(1)." 70 F.4th 1018, 1022 (7th Cir. 2023). The Seventh Circuit took a further step earlier this month in *United States v. Gay*, No. 23-2097, 2024 WL 1595285 (7th Cir. Apr. 12, 2024), and held that Section 922(g) was indeed constitutional at least as applied to a defendant with 22 prior felony convictions. *Id.* at 3. In rejecting Gay's constitutional claim, the panel in *Gay* reviewed the Supreme Court's relevant statements in *Heller*, *McDonald*, and *Bruen* and discussed decisions from the three other circuits that have addressed the constitutionality of Section 922(g) since *Bruen*. *Id*. at *2–3. (citing *United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023), *Vincent v. Garland*, 80 F.4th 1197, 1199–1202 (10th Cir. 2023); *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc), petition for cert. pending under the name *Garland v. Range* (No. 23-

274).³ It acknowledged "for the sake of argument" that there was "*some* room for as applied challenges" to Section 922(g) but concluded there was no problem applying the statute to Gay given his extensive criminal record. *Id.* (emphasis in original)

At the district court level, the overwhelming majority of courts (approximately 200 rulings) have held that Section 922(g)(1) is constitutional. (ECF No. 17 at 3.) All three judges in this district who have addressed the issue have held that a prosecution under Section 922(g)(1) does not offend the Second Amendment. *See United States v. Watson*, No. 23-cr-109, 2023 WL 6623774, at *6 (E.D. Wis. Oct. 11, 2023) (Griesbach, J.); *United States v. Johnson*, No. 22-cr-254, 2023 WL 7284848, at *6 (E.D. Wis. Nov. 3, 2023) (Adelman, J.); *United States v. Davis*, No. 22-cr-210, 2024 WL 490581, at *14 (E.D. Wis. Feb. 8, 2024) (Stadtmueller, J.).

Consistent with *Gay* and for the reasons explained below, this Court joins Judges Griesbach, Adelman, and Stadtmueller and holds that the federal criminal prohibition on felons possessing firearms does not offend the Second Amendment. Accordingly, Neal's motion to dismiss the indictment will be denied.

## III. Convicted Felons Like Neal Are Not Entitled to Bear Arms Under the Second Amendment.

The Second Amendment protects "the right of the people to keep and bear Arms." The amendment "guarantee[s] the individual the right to possess and carry weapons." *Heller*, 554 U.S. at 592. This protection extends to "ordinary, law-abiding" citizens and their right "to carry a handgun for self-defense outside the home." *Bruen*, 547 U.S. at 9. Government efforts to restrict an individual's right to bear arms must be "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 34–35.

Invoking *Bruen*, Neal contends his indictment must be dismissed because Section 922(g)(1) is an unconstitutional restriction on his Second Amendment right to keep and bear arms, both facially and as applied to him. (ECF No. 11 at 1.) In his objections to Magistrate Judge Duffin's report, Neal contends that Section 922(g) cannot survive scrutiny under *Bruen* because he is covered by the plain text of the Second Amendment and the government has failed to show

---

³ *United States v. Perez-Garcia* suggests that the Ninth Circuit would also rule that Section 922(g)(1) remains constitutional after *Bruen*. 96 F.4th 1166 (9th Cir. 2024). In *Perez-Garcia*, that court rejected a Second Amendment challenge to the Bail Reform Act, holding that a person awaiting trial lacks a constitutional right to carry firearms and basing its decision in part on "a lengthy and extensive Anglo-American tradition of disarming individuals who are not law-abiding, responsible citizens." 96 F.4th at 1171, 1186. Citing to *Perez-Garcia*, the *Gay* court also concluded that "parolees lack the same armament rights as free persons." *Gay*, 2024 WL 1595285 at *3 (citing *Perez-Garcia*, 96 F.4th 1166).

that Section 922(g)(1) is consistent with the Nation's history and tradition of firearm regulation. (ECF No. 16 at 3–5.) Citing the Seventh Circuit's pre-*Bruen* decision in *Meza-Rodriguez*, Neal contends that felons are part of "the people" protected by the Bill of Rights. (*Id.* at 3 (quoting *Meza-Rodriguez*, 798 F.3d at 669).) He also accuses the magistrate judge of "sidestepp[ing]" the analysis outlined in *Bruen* and failing to hold the government to its burden of showing the felon in possession statute is consistent with the history and tradition of firearms regulations. (*Id.* at 2–5.)

The government opposes Neal's challenge. It points to the Supreme Court's repeated statements that laws prohibiting felons from possessing firearms do not offend the Second Amendment. (ECF No. 17 at 2–3.) And, consistent with the textual inquiry required by *Bruen*, the government argues that Neal and other convicted felons were never understood be included in "the people" afforded Second Amendment protections. (ECF No. 13 at 6–9.) Instead, the Second Amendment's protections extend only to "ordinary, law-abiding, adult citizens," *Bruen*, 597 U.S. at 31–32, who are "members of the political community." *Heller*, 554 U.S. at 580. The government further contends that Section 922(g)'s prohibition on felon firearm possession is "consistent with Nation's historical tradition of firearm regulation," including long-established regulations aimed at disarming groups who are perceived as untrustworthy and a long history of laws authorizing capital punishment and estate forfeiture for felons. (ECF No. 13 at 9–18.)

The Court agrees with the government. As an initial matter, Neal's position is hard to square with the Supreme Court's repeated statements that the Second Amendment does not preclude bans against felons possessing firearms. The majority in *Heller* specifically identified "felons and the mentally ill" as people excluded from the Second Amendment's protection and noted this was a non-exhaustive list. 554 U.S. at 626–27, 627 n.26. The Court underscored this limitation in *McDonald*, repeating its assurances in *Heller* that there was no doubt that "longstanding regulatory measures [such] as 'prohibitions on the possession of firearms by felons and the mentally ill" remained viable. *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626–27). Consistent with these statements, the *Bruen* majority also took pains to emphasize that "the Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding citizen* to possess a handgun . . . for self-defense." 597 U.S. at 8–9 (emphasis added). The Supreme Court characterized the *Bruen* petitioners as "two ordinary, *law-abiding*, adult citizens," who were "part of 'the people' whom the Second Amendment protects." *Id.* at 31–32 (emphasis added) (quoting *Heller*, 554 U.S. at 580). Indeed, as the government points out, *Bruen* used the specific phrase

"law-abiding" citizens no less than *fourteen times* in describing the holders of Second Amendment rights. (ECF No. 13 at 8) (citing *Bruen*, 597 U.S. at 9, 15, 26, 29–31, 33 n.8, 38, 38 n.9, 60, 70–71).) Such intentional and repeated delimitations by the Supreme Court cannot be simply hand-waived away. The Seventh Circuit made the same observation in *Gay*. *See Gay*, 2024 WL 1595285 at *3 ("*Bruen* repeatedly used the phrase 'law-abiding, responsible citizens' or a variant" when describing individuals who possess rights under the Second Amendment).

Neal nevertheless urges the Court to ignore these repeated statements as mere "dicta." (ECF No. 16 at 4.) He points out that the Seventh Circuit panel in *Atkinson* also referred to statements in *Heller* and *McDonald* describing felon-in-possession laws as "presumptively lawful" as "dicta." (*Id.* (citing *Atkinson*, 70 F.4th at 1022).) Neal cannot so easily disregard Supreme Court pronouncements. Calling a higher court's statements dicta does not mean they can be ignored. As the Seventh Circuit has previously observed, "dicta" is used inconsistently. *United States v. Crawley*, 837 F.2d 291, 292–93 (7th Cir. 1988). Certainly, the Supreme Court was not deciding whether Section 922(g) was constitutional in *Heller*, *McDonald*, or *Bruen*, and thus, in a sense, its statements on felon in possession restrictions were not the holdings of those cases. But, at the same time, the Court's repeated efforts to limit its holdings, by emphasizing—in all three decisions—that its rulings should not cast doubt on felon-in-possession restrictions, are not meaningless, offhand remarks. The Supreme Court obviously thought it important to emphasize again and again that its construction of the Second Amendment did not call felon-in-possession laws into question.[4]

Moreover, the record confirms that enforcing Section 922(g)(1) against Neal is consistent with this nation's history and tradition. In *Bruen*, the Court explained that where a statute addresses a general societal problem that has persisted since the 18th century, it will pass muster if the government provides examples of "distinctly similar" historical regulation. *See* 597 U.S. at 26. Where a modern statute reflects "unprecedented societal concerns or dramatic technological changes," the government is required to show "relevantly similarly" historical analogues. *See id.* at 27, 29. The Court also made clear it did not intend to create a separate "distinctly similar" test for analyzing longstanding societal problems. Instead, "the lack of a distinctly similar historical

---

[4] Ironically, Neal simultaneously refers to the Seventh Circuit's comments in *Atkinson* as an "explicit holding." (ECF No. 16 at 4.) But, of course, *Atkinson* did not finally decide anything. The Court of Appeals remanded the case to the district court to decide the constitutionality of Section 922(g) in the first instance.

regulation addressing [a longstanding societal problem] is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment," rather than dispositive of the issue. *See id.* at 26–27 (emphasis added). Although *Bruen* contemplated both "fairly straightforward" and "more nuanced" historical inquiries, the Court did not establish different evidentiary burdens or tests. *Id.* *Bruen* established a single test that is satisfied when a modern law is "relevantly similar" to "historical analogues." *See United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) ("The core question is whether the challenged law and proffered analogue are 'relevantly similar.'") (quoting *Bruen*, 597 U.S. at 29); *United States v. Alaniz*, 69 F.4th 1124, 1129–30 (9th Cir. 2023) (rejecting defendant's argument that government must "present a 'distinctly similar' historical analogue") (quoting *Bruen*, 597 U.S. at 26)).

The government argues that Section 922(g)(1) remains constitutional because the statute is consistent with this nation's historical tradition of (1) categorically prohibiting firearm possession by groups who could not be trusted to adhere to the rule of law and (2) punishing felons through capital punishment and estate forfeiture. (ECF No. 13 at 9–18.) The government notes that restrictions on the possession of firearms date back to the 1600s in England. In 1689, Parliament passed a law forbidding Catholics, who refused to renounce their faith, from owning firearms. (*Id.* at 10 (citing 1 Wm. & Mary, Sess. 1, c. 15 (1688).) The Protestant majority perceived such Catholics as "untrustworthy." *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting); *Jackson*, 69 F.4th at 502; *see also Heller*, 554 U.S. at 929–93 (Scalia, J.) ("Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents."). This same Parliament wrote the 1689 English Bill of Rights, which enshrined basic civil liberties and included the "predecessor to our Second Amendment." *Bruen*, 597 U.S. at 44 (quoting *Heller*, 554 U.S. at 593). The English Bill of Rights specified that "Protestants . . . may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.* (quoting 1 Wm. & Mary c.2, § 7, in 3 Eng. Stat. at Large 417 (1689)); *see also Range*, 69 F.4th at 1201 (Krause, J., dissenting) ("Following the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants.").

In colonial America, this tradition of disarming the untrustworthy continued. As persuasively argued by the government, "[f]irearm regulations directed toward disarming Native Americans and Black people were pervasive." (ECF No. 13 at 11 (citing numerous sources)); *see*

*also United States v. Gates*, No. 22-cr-397-1, 2023 WL 5748362, at *7 (N.D. Ill. Sept. 6, 2023) ("Though these categorical bans on possession would, of course, be unconstitutional today (and are and were shameful), the regulations do evince a historical tradition of categorically disarming groups—including those deemed 'dangerous'—at the time of the ratification of the Bill of Rights."). The colonies also disarmed not only Native Americans and Black people but also free Christian white men "whom the authorities believed could not be trusted to obey the law." *See Range*, 69 F.4th at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy 174 (3d ed. 2022)). The government cites the Massachusetts government disarming the supporters of a preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because "the authorities concluded their conduct evinced a willingness to disobey the law." (ECF No. 13 at 12 (quoting *Range*, 69 F.4th at 123 (Krause, J. dissenting) (collecting sources)).)

Throughout the Revolutionary War, the legislatures of the American colonies enacted laws that disarmed individuals who refused to take an oath of loyalty. As referenced by the government, during this era the Continental Congress, Massachusetts, Rhode Island, North Carolina New Jersey, Pennsylvania, and Virginia prohibited the possession of firearms by individuals who refused to take such an oath. (*Id.* at 12–13 (collecting sources).) By 1791, the year the Second Amendment was ratified, legislatures had an established tradition of disqualifying categories of individuals from bearing arms based on a judgment that they could not be trusted to adhere to the rule of law. In 1787, when the Pennsylvania ratifying convention met, one of the "'main issues throughout the . . . debate' was the Antifederalists' objection the Constitution's 'lack of a Bill of Rights.'" (ECF No. 13 at 13 (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 627 (1971)) [hereinafter Schwartz].) Four years later, the Pennsylvania Antifederalists proposed a constitutional amendment regarding the right to bear arms: "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individual." (*Id.* (citing Schwartz at 665) (emphasis removed).)

The government also relies on the fact that, during the Revolutionary era, the American colonies authorized capital punishment and estate forfeiture for felony convictions. (*Id.* at 1518.) "In 1769, William Blackstone defined felony as an 'offense which occasions a total forfeiture of either lands, or goods, or both, at the common law, and to which capital or other punishment may be superadded, according to the degree of guilt.'" (*Id.* at 15 (quoting 4 William Blackstone,

Commentaries on the Laws of England 95 (1769) [hereinafter Blackstone].) Felonies were so connected with capital punishment that it was "hard to separate them." (*Id.* (quoting Blackstone at 98).) At the time, felony crimes in England included crimes of violence such as murder and rape, but also included nonviolent offenses such as counterfeiting currency, embezzlement, and desertion from the army. Blackstone at 90–103. At the time of the Second Amendment's ratification, forgery and horse theft—both nonviolent crimes—were capital offenses. Stuart Banner, The Death Penalty: An American History 23 (2022) [hereinafter Banner]. Thus, capital punishment for felonies was "ubiquit[ous]" in the late 18th Century and "the standard penalty for all serious crimes." *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Banner at 23); *see also Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (noting that capital punishment and estate forfeiture were commonly authorized punishments in the colonies).

Thus in 1791, "felons were usually executed and their assets (including firearms) seized following conviction." *Johnson*, 2023 WL 7284848, at *5; *see also Jackson*, 69 F.4th at 503 (citing laws authorizing "punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate"); *United States v. Hardy*, No. 23-cr-129, 2023 WL 6795591, at *6 (N.D. Ill. Oct. 13, 2023) ("[C]ommon sense dictates that firearm dispossession for felons is a 'comparable burden on the right of armed self-defense' when the historical alternatives were death or surrendering one's assets.") (quoting *Bruen*, 597 U.S. at 29). "The framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." Dru Stevenson, In Defense of Felon-in-Possession Laws, 43 Cardozo L. Rev. 1573, 1587 (2022). "As a matter of logic and experience, it makes sense that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a 'comparable burden,' as *Bruen* frames the standard, to historical punishments for felonies." *Gates*, 2023 WL 5748362, at *8 (citation omitted).

Judge Duffin recognized that a "lifetime ban on felons possessing firearms is consistent with history and tradition, particularly when it is remembered that, at the time of the founding, felonies could be punished with death." (ECF No. 15 at 14.) It stretches logic to suggest that an individual convicted of a felony, who at the time of the founding would have faced death and estate forfeiture, would also have been understood to be entitled to possess firearms.

As Judge Griesbach noted:

> Modern laws prohibiting felons from possessing firearms are analogous but far more reasonable and just than the early English and revolutionary period laws that prohibited religious minorities or Native Americans from doing so. The modern laws also reflect the societal changes that have occurred since those earlier times, most notably, the reduction in the severity of penalties for most felonies, including the almost complete elimination of the death penalty; the degree to which firearms are no longer, for many, an essential tool for putting food on the table; and the technological improvements in commonly available firearms, making them far more efficient and dangerous than at the time the Second Amendment was ratified. Given this changed world, laws prohibiting firearm possession by felons are fully consistent with the historical understanding of the Second Amendment.

*Watson*, 2023 WL 6623774, at *5. Neal contends that neither the government nor the recommendation identifies a single instance of a felon's permanent disarmament prior to 1968. (ECF No. 16 at 5.) *Bruen*, however, "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 597 U.S. at 30 (emphasis in original). "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* Based on the historical record presented by the government, the government has demonstrated that this nation has a history of disqualifying categories of people from possessing firearms to address a threat purportedly posed by these people deemed "potentially irresponsible" and to prevent "lawlessness." *See Jackson*, 69 F.4th at 504–05. The government has met its burden and satisfactorily demonstrated that Section 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" and "is part of the historical tradition the delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

In *Gay*, the Seventh Circuit acknowledged the limited possibility of an "as applied" challenge to Section 922(g)(1) for non-violent offenders. 2024 WL 1595285 at *3. To the extent Neal is making such an "as applied" challenge here, his position is rejected. Like the defendant in *Atkinson*, Neal has "not provide[d] much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes." 70 F.4th at 1023. And, unlike the defendant whose as-applied challenge was accepted by the Third Circuit in *Range*, Neal's prior convictions are not for a non-violent misdemeanor (welfare fraud). 69 F.4th at 98. Neal has three prior convictions for two serious state law felonies, two convictions for

fleeing police officers and one conviction for possession with intent to distribute marijuana. The convictions resulted in him serving 18 months' incarceration. Fleeing from police officers is not a minor financial offense; it is a dangerous crime. *See, e.g.*, Jonah Chester, *Hot Pursuit: Milwaukee Police Chases Now Top 1,000 Per Year. Some Prove Deadly.* Wisconsin Watch, (Aug. 2, 2023), https://wisconsinwatch.org/2023/08/milwaukee-police-chase-pursuit-some-deadly/. The Seventh Circuit has also recognized that drug dealing, even if no firearm is located, is "associated with dangerous and violent behavior" that "warrant[s] a higher degree of precaution." *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011). Neal's own alleged conduct in this case underscores the potential danger associated with both of his prior convictions. He stands accused of continuing to engage in the same dangerous conduct by driving recklessly and speeding, forcing police officers to chase him down an alley, where he is alleged to have discarded a loaded gun into dumpster, after which officers found evidence of drug dealing. While he retains his presumption of innocence, the behavior alleged—possession of a gun along with the tools of a drug dealer— reinforces the concept that the combination of drugs and guns creates a danger for our community, a risk Congress sought to address by prohibiting the possession of firearms by non-law-abiding, convicted felons. In addition, like the defendant in *Gay*, who was on parole when arrested and thus prohibited from possessing a firearm as a condition of that parole, Neal was on extended supervision when he was arrested. "[P]arolees lack the same armament rights as free persons." *Gay*, 2024 WL 1595285 at *3. Neal is clearly among the class of individuals constitutionally prohibited from possessing a firearm under Section 922(g)(1) and any as-applied challenge therefore fails.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Court **OVERRULES** Defendant's objections to Judge Duffin's Report and Recommendation, ECF No. 15, and **ADOPTS** the Recommendation of Judge Duffin that the defendant's motion to dismiss be denied.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss Count One of the Indictment as Unconstitutional, ECF No. 11, is **DENIED**.

Dated at Milwaukee, Wisconsin on April 25, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge